IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 696 CAP |
| | : | |
| Appellee | : | Appeal from the Order of the Court of |
| | : | Common Pleas of Fayette County, |
| | : | Criminal Division, entered on January |
| v. | : | 17, 2014 at No. CP-26-CR-0001229- |
| | : | 2004. |
| | : | |
| JAMES W. VANDIVNER, | : | SUBMITTED: February 10, 2016 |
| | : | |
| Appellant | : | |

## OPINION

**JUSTICE TODD** **DECIDED: February 5, 2018**

This capital case, wherein Appellant James VanDivner appeals the Fayette

County Court of Common Pleas' denial of his petition for relief under the Post

Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, is before this Court following

two remands to the PCRA court for supplemental opinions. In response to the PCRA

court's second supplemental opinion, Appellant requested, and was granted, permission

to file a supplemental brief, and thereafter did so. Although also permitted to do so, the

Commonwealth did not file a brief in response. *See infra*, note 11. For the reasons that

follow, we conclude that Appellant is intellectually disabled, and, thus, ineligible for the

death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding the Eighth

Amendment to the United States Constitution prohibits imposition of the death penalty

upon intellectually disabled criminals). Accordingly, we vacate his judgment of sentence

of death and direct that his judgment of sentence be modified to reflect the imposition of

a life sentence on his first-degree murder conviction, subject to appellate review of his remaining guilt phase and sentencing claims. Moreover, as this matter is now a non-capital case, we transfer this appeal to the Superior Court for disposition of these remaining claims.

## I. Background

In July 2004, Appellant fatally shot his fiancée, Michelle Cable. We summarized the facts surrounding the murder in our opinion on Appellant's direct appeal:

> Jessica Cable and her mother Michelle Cable lived at 100 East Second Street, Grindstone, Fayette County. On July 5, 2004, Jessica was babysitting at a neighbor's home. Between 8:30 and 9:00 p.m., Jessica saw [A]ppellant driving in the direction of her home and immediately ran home. When she arrived, she saw [A]ppellant get out of his vehicle and walk to the back porch of her home. As Jessica followed, [A]ppellant entered the home through the back door and, while walking through the home, encountered a family friend, Larry Newman, in the living room. Appellant asked Larry where Michelle was, and Larry pointed to the front door. Appellant then opened the door and walked onto the sun porch.
>
> On the steps leading to the sun porch from the outside, [A]ppellant met Michelle and her son, Billy Cable. As [A]ppellant walked onto the porch, Billy told him, "Dude, get off my property." Notes of Testimony ("N.T."), 2/7/07, at 36. Appellant then pointed a gun at Michelle, at which point, Billy pounced on [A]ppellant in an attempt to wrestle the gun from his hand. Appellant managed to keep the gun and pointed it at Larry Newman's head. Larry's relative, Kenneth Newman, then rushed [A]ppellant, and the gun fired. Appellant, who still had the gun, walked quickly to Michelle and told her he was going to kill her. He grabbed her by the hair, shot her in the head, and, as she fell to the ground, stated, "There, you bitch, I said I was going to kill you." *Id.* at 39. Appellant smiled and walked away. A motorist who was passing by saw [A]ppellant grab Michelle by the hair and shoot her in the head.

Meanwhile, after unsuccessfully attempting to take the gun from [A]ppellant, Billy had gone inside the home to look for a weapon to protect his family. When he was unable to find a weapon, he left the home. As he stepped off the back porch, Billy saw [A]ppellant walking toward him with the gun in his hand. Appellant pointed the gun at Billy, who turned to run away. Appellant shot Billy in the neck and then left the scene. Police subsequently apprehended [A]ppellant in a field and recovered a Jennings J22 handgun. As [A]ppellant was being taken into an interview room at the Pennsylvania State Police barracks, he blurted out to Trooper James Monkelis, "This is a death penalty case and I don't want the needle, life for a life. Tell the DA I will plead guilty to life. I would have killed myself if I knew Michelle was dead." N.T., 2/8/07, at 255.

*Commonwealth v. VanDivner*, 962 A.2d 1170, 1173-74 (Pa. 2009) *("VanDivner I")*.

Prior to trial, Appellant filed a motion to preclude the Commonwealth from seeking the death penalty, contending he is intellectually disabled[1] per *Atkins* and, thus, that imposition of the death penalty would constitute cruel and unusual punishment. The trial court conducted a four-day hearing, after which it determined that Appellant failed to establish that he was intellectually disabled. Specifically, the trial court observed that, under *Commonwealth v. Miller*, 888 A.2d 624 (Pa. 2005), an individual is intellectually disabled for purposes of the Eighth Amendment if he demonstrates (1) limited intellectual functioning; (2) significant adaptive limitations; and (3) onset prior to age 18. Concluding that Appellant failed to demonstrate that his intellectual disabilities

---

[1] Previously, the term "mental retardation" was commonly utilized by the professional community and courts in discussing *Atkins* challenges. However, in *Hall v. Florida*, 134 S.Ct. 1986, 1990 (2014), the high Court recognized that the preferred term is "intellectual disability." Accordingly, in this opinion, we will use the term "intellectual disability," unless we are quoting from other sources. *See Commonwealth v. Bracey*, 117 A.3d 270, 271 n.1 (Pa. 2015).

manifested prior to age 18 − the third prong − the court declined to make a determination of whether the other two *Miller* prongs were established.

The jury convicted Appellant of first-degree murder for the death of Michelle; criminal attempt to commit criminal homicide with respect to Billy; and the aggravated assault of Larry Newman.[2]  At the conclusion of the penalty hearing, the jury found two aggravating circumstances: (1) in the commission of the offenses, Appellant knowingly created a grave risk of death to another person in addition to the victim;[3] and (2) Appellant had a significant history of felony convictions involving the use or threat of violence.[4]  The jury found one mitigating circumstance related to Appellant's character and the circumstances of his offense (the "catchall" mitigator),[5] but concluded the aggravating circumstances outweighed the mitigating circumstance, and recommended a sentence of death.  On February 12, 2007, the trial court formally imposed a death sentence on the murder conviction, and consecutive terms of 20 to 40 years imprisonment for attempted homicide and 10 to 20 years imprisonment for aggravated assault.

This Court affirmed Appellant's judgment of sentence on January 23, 2009. *VanDivner I, supra*.  In so doing, we rejected Appellant's challenges to the sufficiency and weight of the evidence, several of the trial court's evidentiary rulings, and the trial court's determination that Appellant was not intellectually disabled per *Atkins*.

On July 20, 2010, Appellant filed a *pro se* PCRA petition.  Following the appointment of counsel, amended petitions were filed on May 25, 2012 and October 17, 2012, wherein Appellant raised numerous issues relating to, *inter alia*, the weight of the

---

[2] Appellant was represented at trial and on direct appeal by Susan Ritz Harper, Esquire. Appellant was represented at the penalty phase of his trial by Dianne Zerega, Esquire.
[3] 42 Pa.C.S. § 9711(d)(7).
[4] 42 Pa.C.S. § 9711(d)(9).
[5] 42 Pa.C.S. § 9711(e)(8).

evidence, the prosecutor's alleged misconduct, the trial court's evidentiary rulings, the trial court's jury instructions, counsel's alleged ineffectiveness, and his mental capacity. Following four days of hearings,[6] the PCRA court denied Appellant relief on January 17, 2014, and Appellant filed an appeal with this Court.

On appeal, we observed that Appellant raised claims pertaining to his pre-trial, guilt, and penalty-phase proceedings. However, noting that our resolution of Appellant's assertion, set forth as an ineffectiveness claim, that he was ineligible for the death penalty under *Atkins* and *Miller* would dictate our review of Appellant's remaining claims,[7] we addressed that issue first. Following an extensive review of the record, this Court determined that the PCRA court's factual finding that Appellant failed to establish that his intellectual disabilities existed prior to the age of 18 was not supported by substantial evidence, and, therefore, that Appellant established that this underlying claim of his ineffectiveness assistance of counsel claim had arguable merit.[8] Thus, on December 29, 2015, we vacated the PCRA court's order and, retaining jurisdiction, remanded the matter to the PCRA court for a supplemental opinion, specifically stating:

> [I]n order to prevail on a claim of ineffectiveness under the PCRA, a petitioner must also establish that no reasonable basis existed for counsel's action or failure to act, and that the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a

---

[6] Hearings were conducted on October 24, 2012; November 16, 2012; January 30, 2013; and February 28, 2013. The Honorable Gerald R. Solomon presided over Appellant's trial and PCRA proceedings.

[7] *See Commonwealth v. Gibson*, 925 A.2d 167, 171 (Pa. 2007) (non-capital cases are within the jurisdiction of the Superior Court).

[8] For a detailed discussion of the evidence establishing that Appellant's intellectual disabilities existed prior to the age of 18, including, *inter alia*, school records indicating Appellant's IQ test scores, student records demonstrating Appellant's placement in special education classes, and expert testimony regarding state regulations for placement in special education, *see Commonwealth v. VanDivner*, 130 A.3d 676 (Pa. 2015) ("*VanDivner II*").

reasonable probability that the result of the proceeding would have been different. [*Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001)]. The PCRA court, having concluded Appellant's claim did not have arguable merit, did not address these two additional prongs of the ineffectiveness analysis.

Accordingly, we vacate the PCRA court's order and remand this matter to the PCRA court for preparation of a supplemental opinion addressing whether any reasonable basis existed for trial counsel's failure to investigate the state regulations pertaining to special-education placement which existed when Appellant was a student; failure to seek additional school records for Appellant and his siblings after initially receiving only Appellant's attendance record for the 1964-1965 school year; and failure to present the testimony of Dr. Sheetz, the individual responsible for special education placement at the time Appellant was a student.

Additionally, because a petitioner seeking relief under the PCRA must demonstrate prejudice by showing there is a reasonable probability that the result of the proceeding would have been different, the PCRA court must also consider whether, by demonstrating that his intellectual disabilities existed prior to age 18, Appellant's petition to preclude imposition of the death penalty pursuant to *Atkins* and *Miller* would have been granted. In making this determination, the PCRA court must address the first and second prongs of *Miller*, and, specifically, should consider and address Appellant's claim that trial counsel was ineffective for failing to introduce evidence that an intellectually disabled individual could pass the non-written [Commercial Driver's License ("CDL")] test after extended study, as this claim is relevant to the second prong of *Miller* — limitations in adaptive behavior.

*VanDivner II*, 130 A.3d at 696. Chief Justice Saylor filed a concurring opinion, expressing his reservation with respect to evaluating Appellant's *Atkins/Miller* claim within the construct of an ineffectiveness of counsel claim, including whether such a claim could ever be dismissed on reasonable strategy grounds.

On January 12, 2016, the PCRA court issued a 2-page opinion concluding, without discussion of the specific lapses identified by this Court, that trial counsel had

no reasonable basis for failing to present evidence that Appellant's intellectual disabilities manifested prior to age 18. The court further opined:

> [N]o greater prejudice can exist as to VanDivner than this Court's rulings that he was eligible for the imposition of the death penalty, when as a matter of law the Supreme Court of Pennsylvania has in essence ruled that he is not so eligible.

PCRA Court Opinion, 1/12/16, at 2.

Finding that the PCRA court misapprehended our opinion and remand instructions,[9] on April 25, 2016, this Court, again retaining jurisdiction, remanded the matter to the PCRA court for a second supplemental opinion, specifically directing the PCRA court to assess whether Appellant presented sufficient evidence at his pretrial hearing to prove the first and second prongs of *Miller*, and, if it concluded that he did not, to consider the additional evidence presented at the PCRA hearing − specifically, the evidence that an intellectually disabled individual could pass the non-written CDL test after extended study.[10] We explained that, if the PCRA court found the additional evidence presented at the PCRA hearing persuasive, the court then must consider and

---

[9] Contrary to the PCRA court's statement, in our December 29, 2015 Opinion, we did not hold that Appellant was ineligible for the death penalty. Rather, we determined that the evidence presented at Appellant's PCRA hearing established the third *Miller* prong − that Appellant's intellectual disabilities manifested prior to age 18. Furthermore, notwithstanding our instructions, the PCRA court failed to consider, as required in determining whether counsel's failure to present evidence of the pre-18 age of onset prejudiced Appellant, whether Appellant presented sufficient evidence at his pretrial hearing to prove the first and second prongs of *Miller* − limited intellectual functioning and significant adaptive limitations.

[10] Following the issuance of the PCRA court's opinion, on January 26, 2016, Appellant filed an application for relief, requesting that this Court: (1) vacate the death sentence and impose a life sentence; and (2) decide the remaining guilt-phase issues without remanding them for consideration by the Superior Court. In light of our remand of the matter for a second supplemental opinion, we denied Appellant's application for relief without prejudice to refile his application after the PCRA court's second supplemental opinion was filed.

address Appellant's claim that trial counsel had no reasonable basis for failing to introduce such evidence at the pretrial hearing.

On December 8, 2016, the PCRA court issued a second supplemental opinion, concluding that Appellant presented sufficient evidence at the pretrial hearing to establish that his IQ was less than 70, thereby establishing the first prong of *Miller*. However, based on the evidence introduced at the pretrial hearing and the additional evidence presented at the PCRA hearing, the court concluded Appellant failed to establish that he has significant adaptive limitations, as required under the second prong of *Miller*.

On February 2, 2017, Appellant filed a request for permission to submit a supplemental brief in response to the PCRA court's December 8, 2016 supplemental opinion. This Court granted Appellant's request, and allowed the Commonwealth 30 days in which to respond to Appellant's brief. Appellant filed a supplemental brief on April 10, 2017, and, on June 21, 2017, the Commonwealth filed a letter indicating it would not be filing a responsive brief, which, by that time, would have been untimely.[11] Accordingly, the matter is once again ripe for our review.

## II. Analysis

Preliminarily, in order to qualify for relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2); that his claims

---

[11] In its no-answer letter, the Fayette County District Attorney states: "although the Commonwealth does object to the Superior Court granting Petitioner's Petition for Allowance of Appeal, the Commonwealth will not be filing Brief in Opposition." Commonwealth's No-Answer Letter, 6/21/17. Although the District Attorney refers to the Superior Court, rather than this Court, and suggests that the instant case involves a petition for allowance of appeal, when, in fact, it is a *direct capital PCRA appeal,* we will presume that the Commonwealth does, indeed, intend to waive its right to file a responsive brief in this matter.

have not been previously litigated or waived; and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. *Id.* § 9543(a)(3), (a)(4).

Additionally, to obtain relief under the PCRA based on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In Pennsylvania, we have applied the *Strickland* test by requiring a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required prong of the *Strickland* test, the court may dismiss the claim on that basis. *Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010).

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is "supported by the record and free of legal error." *Commonwealth v Rainey*, 928 A.2d 215, 223 (Pa. 2007). With respect to a PCRA court's determination as to whether a petitioner is intellectually disabled under *Miller*, this Court's review involves a mixed question of law and fact:

> A question involving whether a petitioner fits the definition of [intellectual disability] is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its

application of the law to the facts is likely to be more accurate.

*VanDivner II*, 130 A.3d at 693 (quoting *Bracey*, 117 A.3d at 273).

As we explained in our prior opinion in this matter, this Court, in *Miller*, set forth the requirements for establishing that an individual is intellectually disabled under *Atkins*. In *Miller*, we considered the definition of intellectual disability used by the American Association of Mental Retardation ("AAMR"), now the American Association on Intellectual and Developmental Difficulties ("AAIDD"), and the American Psychiatric Association ("APA") standard set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV"). The AAIDD defines intellectual disability as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." *Miller*, 888 A.2d at 629-30 (quoting Mental Retardation: Definition, Classification, and Systems of Supports 1 (10th ed. 2002)). The APA's definition, as set forth in the DSM–IV, defines "mental retardation" as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." *Id*. at 630 (quoting DSM-IV at 37).

We observed in *Miller* that the above definitions share three concepts: limited intellectual functioning, significant adaptive limitations, and onset prior to age 18. Regarding the concept of limited intellectual functioning, we explained:

> Limited or subaverage intellectual capability is best represented by IQ scores, which are approximately two standard deviations (or 30 points) below the mean (100). The concept should also take into consideration the standard error of measurement (hereinafter "SEM") for the specific assessment instruments used. The SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Thus, for example, a subaverage intellectual capability is commonly

ascribed to those who test below 65-75 on the Weschler scales.

*Id.* (citations omitted).

Recognizing that, pursuant to both the AAIDD and DSM-IV, a low IQ score is not, in and of itself, sufficient to support a classification of intellectually disabled, we considered the factors relevant to the second prong − the existence of limitations in adaptive behavior:

> Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life. The [AAIDD] recommends that such limitations should be established through the use of standardized measures. "On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."

*Id.* at 630-31 (citations and footnote omitted).

This Court in *Miller* did not discuss at length the third concept − age of onset − stating, "[w]e see no need to explore the concept of age of onset further, since this requirement is self explanatory and both the [AAIDD] and the DSM-IV require that the age of onset be before age 18." *Id.* at 630 n.7.

In sum, we stated:

> What is clear from the above is that [the AAIDD and the DSM-IV] definitions are very similar and diagnosis under either system of classification takes into account like considerations. Therefore, we hold that a PCRA petitioner may establish his or her mental retardation under either classification system and consistent with this holding, assuming proper qualification, an expert presented by either

> party may testify as to mental retardation under either classification system. Moreover, consistent with both of these classification systems, we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation.

*Id.* at 631.

In the case *sub judice*, the PCRA court has acknowledged that the evidence demonstrates that Appellant's IQ is less than 70, establishing the first prong of *Miller.* Further*,* this Court previously held that, notwithstanding the PCRA court's prior conclusion to the contrary, the evidence established that Appellant's intellectual disability existed prior to the age of 18, thereby establishing the third prong of *Miller*. *VanDivner II*, 130 A.3d at 695. Thus, the sole remaining inquiry in determining whether Appellant is intellectually disabled under *Miller* is whether Appellant suffers from significant limitations in adaptive behavior − the second prong of *Miller*. In the instant case, and as will become evident below, Appellant's ability to obtain a CDL has been a significant focus in this determination.

As noted above, the AAIDD defines adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." *Intellectual Disability: Definition, Classification, and Systems of Supports* 15 (11th ed. 2010). Conceptual skills include language; reading and writing; and money, time, and number concepts. Practical skills relate to the activities of daily living, including personal care; occupational skills; health care; travel/transportation; schedules and routines; safety; use of money; and use of the telephone. Finally, social skills include interpersonal skills; social responsibility; self-esteem; gullibility; naiveté; social problem solving; the ability to follow rules and obey

laws; and the ability to avoid being victimized.  *Id.* at 44; *see also Miller*, 888 A.2d at 630 n.8.[12]

The AAIDD offers that "[a] comprehensive assessment of adaptive behavior will likely include a systematic review of the individual's family history, medical history, school records, employment records (if an adult), other relevant records and information, as well as clinical interviews with a person or persons who know the individual well."  *Intellectual Disability: Definition, Classification, and Systems of Supports* at 45.  Ideally, such information will be obtained from those who "have had the opportunity to observe the person function across community settings and times.  Very often, these [people] are parents, older siblings, other family members, teachers, employers, and friends."  *Id.* at 47.

Finally, the assessment of adaptive behavior, according to the AAIDD, is based on an individual's *typical*, not maximum, performance:

> The assessment of adaptive behavior focuses on the individual's typical performance and not their best or assumed ability or maximum performance.  Thus, what the person typically does, rather than what the individual can do or could do, is assessed when evaluating the individual's adaptive behavior.  This is a critical distinction between the assessment of adaptive behavior and the assessment of intellectual functioning, where best or maximal performance is assessed.  Individuals with an [intellectual disability] typically demonstrate both strengths and limitations in adaptive behavior.  Thus, in the process of diagnosing [intellectual disability], significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills.

*Id.*

---

[12] Similarly, the DSM-IV requires significant limitation in at least two of the following areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Miller*, 888 A.2d at 630 n.8.

Indeed, in *Commonwealth v. Williams*, 61 A.3d 979, 992 (Pa. 2013), we noted that, in determining whether an individual has significant limitations in adaptive functioning,

> the focus should be on an individual's weaknesses − not his or her strengths − as [intellectually disabled] people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family. This is represented in the DSM-IV and [AAIDD's] definitions by an individual's classification as [intellectually disabled] even though he may have relatively strong skills in distinct categories.

*Id.* at 992. Further, the United States Supreme Court, in *Moore v. Texas*, 137 S.Ct. 1039, 1050 (2017), recently confirmed that, in assessing an individual's adaptive functioning for the purpose of determining whether the individual is intellectually disabled under *Atkins*, the focus should be on the individual's adaptive deficits, rather than his or her adaptive strengths.[13]

At his pretrial hearing,[14] Appellant presented the testimony of Dr. Lawson Frederick Bernstein, Jr., a clinical and forensic neuropsychiatrist, who performed a

---

[13] We recognize that the instruction in our April 25, 2016 *per curiam* order to the PCRA court to consider the "evidence that an intellectually disabled individual could pass the non-written CDL test after extended study," in its assessment of whether the evidence presented at Appellant's PCRA hearing was sufficient to prove the first and second prongs of *Miller*, could be viewed as contrary to this standard. Nevertheless, we apply the *Williams* standard herein.

[14] We note that, in our April 25, 2016 *per curiam* order, we instructed the PCRA court to assess whether Appellant presented sufficient evidence at *both* his pretrial hearing and his PCRA hearing to prove the first and second prongs of *Miller*. *See* Order, 4/25/16, at 4 ("[O]n remand, the PCRA court must assess whether Appellant presented sufficient evidence at his pretrial hearing to prove [the first and second prongs of *Miller*.] If the PCRA court concludes that Appellant did not present sufficient evidence at the pretrial hearing to satisfy these prongs, the PCRA court should proceed to consider the additional evidence presented at the PCRA hearing."). In its second supplemental opinion, the PCRA court addressed the evidence regarding Appellant's limited intellectual functioning presented at the pretrial hearing. However, in addressing whether Appellant presented sufficient evidence of limitations in his adaptive functioning, it addressed only the evidence presented at the PCRA hearings. While the (continued…)

neuropsychiatric evaluation of Appellant. With respect to Appellant's adaptive behavior in the area of conceptual skills, Dr. Bernstein testified that Appellant "has a poor memory, he has very poor decision-making skills, he has no financial acumen that I can tell, in terms of managing his own affairs." N.T. Pretrial Hearing, 11/27/06, at 11. Dr. Bernstein further testified that Appellant is "a very poor historian, [and] a very poor communicator"; that Appellant's use of syntax and grammar is "exceedingly poor"; and that Appellant is unable to explain complex concepts. *Id.* at 12.

Adam Sedlock, a psychologist who examined Appellant, also testified regarding Appellant's adaptive behavior in the area of conceptual skills, stating that, in his opinion, Appellant was incapable of reading a newspaper, managing a checkbook, or finding a name in a telephone directory. Mr. Sedlock acknowledged, however, that Appellant would be capable of writing a "simple sentence" and possibly reading "simple directions." *Id.* at 82.

Dr. Bernstein and Mr. Sedlock's pretrial hearing testimony was corroborated by the testimony of one of Appellant's ex-wives, Loura VanDivner, who was married to Appellant for approximately 18 months during 1983-1984. She testified that, during their marriage, Appellant was unable to look up a number in a telephone directory, read the newspaper, manage money, or pay bills. N.T. Pretrial Hearing, 11/29/06, at 103-105. She also testified that Appellant was unable to write a sentence. *Id.* at 104. Alice Lisanti, Appellant's younger sister, testified that, as a child, Appellant could not properly

_____

(…continued)
PCRA court's consideration of the evidence presented at the PCRA hearings seems to suggest that the PCRA court found there was insufficient evidence as to Appellant's limitations in adaptive functioning presented at the pretrial hearings, in considering whether the evidence was sufficient to demonstrate that Appellant suffers from significant adaptive limitations, we consider the evidence presented at both the pretrial hearing and the PCRA hearing.

pronounce words; she never saw him with a book or newspaper; she never saw him read his mail; and his writing and spelling was, and remains, poor. *Id.* at 127-28.

In response to the evidence presented by Appellant at his pretrial hearing, the Commonwealth presented the expert testimony of psychiatrist Dr. Bruce A. Wright. According to Dr. Wright, when he asked Appellant if he could read or write, Appellant responded that he could not, but stated: "If someone helped me, it would be a different story, I think I could read and write. I just never learned." N.T. Pretrial Hearing, 12/8/06, at 211. Dr. Wright further testified that he did not believe Appellant's claim that he is unable to read and write because, after being asked several times, Appellant eventually "did write a sentence." *Id.* at 211, 233. The sentence Appellant wrote was "I love you." *Id.* at 234. Dr. Wright thus concluded that, because Appellant "had the adaptive skills to complete more things than he initially claimed he could do[, t]hat argues against any problems with adaptive functioning." *Id.* at 252.

At his PCRA hearing, Appellant presented additional expert testimony regarding his adaptive behavior in the area of conceptual skills. Dr. Kristine Jacquin, an expert in diagnosing intellectual disabilities, testified that she spent 84 hours evaluating Appellant, which included two full days of evaluating Appellant in person; three days conducting in-person interviews of people who knew Appellant; telephone interviews of people who knew Appellant, and reviewing records. N.T. PCRA Hearing, 11/16/12, at 29-30. In addition to Appellant, Dr. Jacquin interviewed Appellant's brothers, Albert and Harry, and their wives; Appellant's sisters, Mildred and Alice; Appellant's aunts, Trillis Cronin, Cecilia Smith, and a third aunt; Appellant's cousin, Raymond Smith; Appellant's ex-wife, Loura VanDivner; and Appellant's daughter, Jamie. *Id.* at 32.

Dr. Jacquin explained that she administered a variety of tests designed to measure Appellant's adaptive functioning, as well as two tests designed to determine

whether Appellant was malingering,[15] and, based on the results of those tests, concluded that, "in the conceptual adaptive functioning area, [Appellant] showed impaired functioning and that includes not only the overall domain of conceptual adaptive functioning . . . but also the sub-domains within that which are self-direction, language/communication, [and] functional academics." *Id.* at 91-92. As an example of Appellant's impaired conceptual skills, Dr. Jacquin described Appellant's response to her question of how many brothers and sisters he had. Rather than stating that he had seven siblings, Appellant gave the name of two of his siblings. Dr. Jacquin explained that, "rather than responding to the question itself, he responded by addressing something related but not answering the question itself, which I took to mean that he didn't understand the question." *Id.* at 92.

The only evidence presented by the Commonwealth at Appellant's PCRA hearing was the testimony of Appellant's trial attorneys, Dianne Zerega and Susan Harper, regarding their representation of Appellant, and the testimony of Trooper James Monkelis, who was the lead investigator in the crime and offered testimony regarding

---

[15] Dr. Jacquin explained that malingering is, essentially, faking deficits or impairment. N.T. PCRA Hearing, 11/16/12, at 80. She testified that, based on the tests she administered, Appellant was not malingering. *Id.* at 82. Dr. Jacquin further stated that, despite the fact that it is standard practice to test for malingering, the report of Dr. Wright, the Commonwealth's pretrial expert, did not indicate that he administered any test for malingering. *Id.* at 83. According to Dr. Jacquin, "[i]t seemed [Dr. Wright] was making conclusions based simply on his interactions and just drawing conclusions based on his interactions" with Appellant. *Id.* Related to the subject of malingering, Dr. Jacquin also testified that intellectually disabled individuals "rarely actually grasp that they have a disability. And quite the contrary, they often times want to appear their best to other people." *Id.* at 46. This inability to accurately view their abilities and skills is referred to as a "cloak of normalcy" or "cloak of competence." *Id.* at 47. Intellectually disabled individuals will often explain their disabilities with such statements as "[i]t's not that I can't do this. It's that no one ever taught me. It's not that I don't know how to do this, I just haven't done it very much. I haven't practiced very much." *Id.* at 48. Dr. Jacquin noted that Appellant had "said those very things" to her, *id.* at 49, and that Appellant had also made a similar statement to Dr. Wright. *See supra.*

the police investigation. The Commonwealth presented no expert testimony regarding Appellant's limited intellectual functioning or significant adaptive limitations.

Turning to Appellant's adaptive behavior in the area of practical skills, including personal care, occupational skills, health care, travel/transportation, schedules and routines, safety, use of money, and use of the telephone, Dr. Bernstein testified at Appellant's pretrial hearing that, notwithstanding Appellant's "multiple medical problems, [he] is not an individual who's able to engage in the type of routine doctor visits and use of medications to treat those conditions, unless he's in a highly-structured setting, where it's basically done for him. His capacity to anticipate and meet his physical needs, in terms of self-care, as I've described, is exceedingly poor." N.T. Pretrial Hearing, 11/27/06, at 12. Mr. Sedlock similarly opined that, while Appellant is able to bathe himself and brush his teeth, *id.* at 80, he is incapable of scheduling or keeping his own appointments. *Id.* at 77.

Loura VanDivner also testified regarding Appellant's adaptive behavior in the practical skills area. At Appellant's pretrial hearing, she testified that, during their marriage, Appellant did not work, and was unable to dial the telephone, prepare a meal, do laundry, shop, use simple tools, read a map, or make simple home repairs. N.T. Pretrial Hearing, 11/29/06, at 102-10. Appellant's sister, Alice Lisanti, likewise testified that, when Appellant was at her home and wanted to make a telephone call, she would have to look up the number in the telephone directory and dial the telephone for him. *Id.* at 127. Ms. Lisanti also testified that, while Appellant could sign his name, one of his wives or children had to pay his bills and do his shopping. *Id.* at 129.

Dr. Wright, conversely, testified at the pretrial hearing that Appellant's "capacity to eventually pass the CDL examination and to drive the truck over a long haul reveals somebody who's functioning at . . . a level that is not consistent with mental retardation."

N.T. Pretrial Hearing, 12/8/06, at 215. Dr. Wright further suggested that Appellant's limitations in adaptive functioning in the areas of personal care and home-living were the result of Appellant's substance abuse. *Id.* at 277. Dr. Wright conceded, however, that he did not ask Appellant about his ability to take his medication as prescribed, *id.* at 276, and he noted that Appellant failed to tell him that he never drove a truck alone or that his daughter obtained his apartment for him. *Id.* at 278-79.

Appellant presented further evidence of his significant limitations in adaptive behavior in the area of practical skills at his PCRA hearing. Judith DiJoseph, who was married to Appellant from 1988 to 2000 (although she separated from Appellant in 1992), testified that, at one point during their marriage, Appellant was required to take a recertification test in order to obtain his CDL. N.T. PCRA Hearing, 11/16/12, at 126. She testified that, because she was concerned that Appellant would not be able to pass the test on his own, she obtained a copy of the CDL manual and quizzed Appellant for approximately 2 hours every day for a period of two months by reading each question contained in the CDL manual, giving Appellant the answer, and repeating the process until Appellant was able to answer each question. *Id.* at 127. She explained that, even after she thought Appellant knew the answers "well enough to possibly be able to take the test," she "knew that he wouldn't be able to take a written test" because "[h]e didn't really comprehend. He didn't read well." *Id.* at 127-28. Ms. DiJoseph testified that, upon learning that he could take the test orally, she began quizzing Appellant several times a day. *Id.* at 128. She testified that she accompanied Appellant to the testing site. *Id.* at 129. She also explained that, once Appellant passed the oral CDL exam,[16] she accompanied him on his trucking trips because:

---

[16] At Appellant's pretrial hearing, the Commonwealth presented, *inter alia*, the testimony of Ronald W. Beatty, Jr., an employee of the Bureau of Driver Licensing for the Pennsylvania Department of Transportation ("PennDOT"). Mr. Beatty testified that (continued…)

[h]e had a hard time keeping up with the logs and . . . the law says that they have to be done. And the equipment was in my name, so I guess it was a matter of self-preservation, so I went, read the maps, called the brokers to get the information, where we were to pick up after we dropped off a load, and I did the logs. I did all the paperwork.

*Id.* at 130. She also stated that she would hand Appellant the money for the tolls. *Id.*

Ms. DiJoseph testified that, if there was a time she was unable to accompany Appellant on a trip, "one of his brothers would go with him. He never went alone." *Id.* at 137.

At Appellant's PCRA hearing, Dr. Jacquin also testified that Appellant exhibited impaired adaptive functioning in the area of practical skills, including self-care, home living, health and safety, use of community resources, and occupational functioning. N.T. PCRA Hearing, 11/16/12, at 93. With respect to his occupational functioning, for example, she explained that, notwithstanding the fact that he had obtained a CDL license, based on a review of Appellant's social security earnings,

he earned in his working years, only roughly nine percent of what the average American worker earned during those same years which is obviously considerably low, and it was

---

(…continued)

PennDOT records showed that Appellant took a recertification test for a CDL in 1992. N.T. Pretrial Hearing, 11/29/06, at 173. Mr. Beatty also testified that, in 1992, Appellant would have been required to take a 70-question *written* multiple choice test in order to obtain his CDL. *Id.* at 174. When asked by defense counsel if an individual could take the CDL test over the telephone, Mr. Beatty stated that he did not believe the CDL test "was ever administered over the telephone," *id.* at 180, clearly suggesting that Appellant had passed a 70-question written multiple choice test in order to obtain his CDL license. As discussed *infra*, Beatty's testimony ultimately was discredited at Appellant's PCRA hearing by the testimony of Mary Christy, who worked at the Neville Island Driver's License Exam Center in 1992, where Appellant took his recertification test for a CDL. Ms. Christy was shown a paper indicating that Appellant had passed the *non-written* version of the CDL test on February 5, 1992, and she confirmed that the signature on the paper was hers. N.T. PCRA Hearing, 11/16/12, at 7-8. Ms. Christy also explained that, for the non-written CDL exam, a telephone "was hooked up to the computer and the computer would ask questions and all they had to answer was, push button one for true or two for false." *Id.* at 6.

on that basis that I judged his occupational functioning to be impaired. He was not able to hold jobs long enough or jobs of sufficient type to be able to support themselves at a level that the average American worker was able to sustain themselves during that time.

*Id.* at 95-96.

Finally, with regard to Appellant's adaptive behavior in the area of social skills − which include interpersonal skills, social responsibility, self-esteem, gullibility, naiveté, social problem solving, the ability to follow rules and obey laws, and the ability to avoid being victimized − the testimony presented at Appellant's pretrial hearing suggested that Appellant lacks interpersonal skills, has difficulty following rules, is gullible, and was often victimized. *See* N.T. Pretrial Hearing, 11/27/06, at 84 (Mr. Sedlock opining that Appellant was a "follower" (as opposed to a leader), and would have difficulty following rules and following multi-step directions); N.T. Pretrial Hearing, 11/29/06, at 117 (Loura VanDivner testifying that Appellant did not have any friends); *id.* at 122-32 (Alice Lisanti testifying that, as a child, Appellant did not interact with other children, kept to himself, did not get along with his classmates because they made fun of him, and was a follower).[17]

Notwithstanding the evidence and testimony detailed above, the PCRA court determined that Appellant failed to present sufficient evidence that he suffered from significant limitations in adaptive behavior, reasoning:

> The evidence presented at the PCRA hearing included [Appellant's] ex-wife, Judith DiJoseph, who testified that she assisted Petitioner in preparing for the CDL exam by obtaining a study guide from PennDOT and reviewing the materials with [Appellant] for several months. The ability of

---

[17] As with Appellant's limitations in adaptive functioning in the areas of personal care and home-living, Dr. Wright suggested that Appellant's lack of adaptive skills in the area of social skills may have been affected by Appellant's history of substance abuse. N.T. Pretrial Hearing, 12/8/06, at 247.

[Appellant] to learn the content [of a PennDOT study guide for the CDL exam] well enough to pass an oral examination, actually pass the examination, then maintain employment as a successful over-the-road truck driver for many years accepting tasks assigned to him to traverse the country, coupled with the lack of evidence that [Appellant] was ever incompetent at his job, ever received citations for improper driving of his truck, or ever caused a motor vehicle accident as a result of deficient truck driving establishes that he displayed appropriate adaptive functioning in the areas of conceptual, social, and practical skills according to the AAIDD definition of adaptive behavior.

In support of our determination as to social functioning, we note that [Appellant] was married, maintained intimate personal relationships with women, and continued relationships with his family. In support of practical skills, [Appellant] kept trucking logs in the normal course of his business as is required for a truck driver. With respect to the categories identified by the DSM-IV, these same behaviors displayed by [Appellant] establishes that he was not deficient in the areas of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety. As such, [Appellant] has failed to meet his burden with regard to the second prong of *Miller* − significant adaptive limitations.

PCRA Court Second Supplemental Opinion, 12/8/16, at 3-4 (record citation omitted).

The PCRA court further concluded that, because Appellant failed to demonstrate "significant adaptive limitations" under *Miller*, he could not establish that counsel rendered ineffective assistance in failing to present the above-described PCRA hearing evidence at Appellant's pretrial hearing to bar the death penalty. *Id.* at 4.

Upon review, we find that the PCRA court's determination that Appellant failed to prove that he has significant adaptive limitations − which, in combination with his limited intellectual functioning and prior to age 18 onset, would render him ineligible for the death penalty under *Atkins/Miller* − is unsupported in both law and fact. Initially, with regard to the PCRA court's citation to the fact that Appellant was married, maintained intimate relationships with women, and had relationships with his family to support its

conclusion that Appellant does not suffer from limited adaptive functioning in the area of social skills, this Court rejected this same reasoning in *Commonwealth v. Williams*, *supra*.

In *Williams*, the appellee was convicted of first-degree murder and abuse of a corpse and sentenced to death for the stabbing death of his wife. In a PCRA petition, the appellee argued, *inter alia*, that he was ineligible for the death penalty under *Atkins*. Following an evidentiary hearing, the PCRA court concluded the appellee had established that he was intellectually disabled, and it vacated his death sentence. The Commonwealth appealed.

In affirming the PCRA court's decision, this Court concluded there was sufficient evidence to support the PCRA's determination that the appellee established all three prongs of the *Atkins/Miller* test, including significant deficits in adaptive functioning. In that regard, the evidence included testimony that the appellee was unable to read, write, or perform arithmetic; he was at a second-grade reading level; he was unable to manage his finances; he worked at a sausage factory and as a disc jockey, but required supervision at the sausage factory because he had difficulty remembering what spices to include in the sausage mix, and assistance in reading song titles when working as a disc jockey; he neglected his health by refusing treatment for his diabetes; and, although he had several relationships with women and eventually was married, all of the relationships ultimately failed.

Notwithstanding that evidence, the Commonwealth in *Williams* argued that the PCRA court erred in finding the appellee had significant adaptive deficiencies because he was able to provide for his family and was capable of working. This Court rejected the Commonwealth's argument, noting that, in determining whether an individual has limitations in adaptive functioning, the proper focus is on the individual's weaknesses,

not the individual's strengths. 61 A.3d at 992. We further recognized that intellectually disabled individuals "can function in society and are able to obtain and hold low-skilled jobs, as well as have a family." *Id.*[18] Similarly, in the instant case, the mere fact that Appellant was married several times and maintained relationships with his family does not support the conclusion that Appellant does not suffer from limited adaptive functioning in the area of social skills.

In the instant case, the PCRA court also concluded that Appellant's ability to learn the content of the CDL study guide and pass an oral version of the exam, as well as his ability to maintain employment as a "successful over-the-road truck driver" demonstrates that he possesses "appropriate adaptive functioning" in the areas of conceptual, practical and social skills. However, the evidence at both the pretrial and PCRA hearings refutes the PCRA court's determination.

At Appellant's pretrial hearing, for example, when the Commonwealth questioned Dr. Bernstein regarding Appellant's ability to obtain a CDL, Dr. Bernstein explained that the fact that Appellant obtained a CDL is "not an arbiter of who is or isn't mentally retarded. People with mild mental retardation can work and can pass certain vocational tests in order to work." N.T. Pretrial Hearing, 11/27/06, at 29. Likewise, Mr. Sedlock testified at Appellant's pretrial hearing that "individuals with mild mental retardation can obtain jobs," can take "limited tests if they're coached or assisted," and can complete "[r]epetitive, routine tasks." *Id.* at 81.

Moreover, at his PCRA hearing, Appellant presented the testimony of Dr. Eunice Askov, a retired professor of education at The Pennsylvania State University. Dr. Askov testified that, in the late 1980s, she began working closely with PennDOT regarding the

---

[18] One of the two Commonwealth experts in *Williams* was Dr. Bruce Wright, the Commonwealth's expert in this case. In our prior opinion, Dr. Wright was incorrectly identified as Dr. Bryan Wright.

implementation of a program that would enable individuals with limited reading ability to study for and pass the CDL exam. N.T. PCRA Hearing, 10/24/12, at 57. According to Dr. Askov, the CDL manual was rewritten at that time to make it understandable to individuals at a below-4th grade reading level. *Id*. at 61. Dr. Askov indicated that PennDOT also offered an oral CDL exam, and she opined that a "severely limited person intellectually," including an individual with an IQ of below 70, could pass that exam, particularly someone with prior driving experience. *Id*. at 65, 67.

Additionally, following her testimony at Appellant's PCRA hearing that Appellant exhibited impaired adaptive functioning in the area of practical skills, Dr. Jacquin specifically was asked if she had considered the fact that Appellant possessed a CDL when forming her opinion. Dr. Jacquin confirmed that she had, elaborating:

> There were a number of things that I considered with respect to the CDL license. First, just having a driver's license of any kind in and of itself, doesn't negate a finding of mental retardation, or impaired adaptive functioning. It is a skill, like many other skills, wherein a person with mental retardation could have that skill and be able to drive, be able to pass a driver's test. My opinion about that was strengthened when I learned that he took the driver's test orally, so he didn't have to actually write, understand questions that were written, and respond in that way, but instead was able to respond orally. So that makes the test much easier. Then I also read an affidavit from his ex-wife, Judith, in which she said that she helped him study for months and months and months for the test, which also further strengthened my opinion that it wasn't terribly difficult, it wasn't a terribly difficult test. He was able to at least master the basic information enough to pass the test. And that's not inconsistent with his situation. It is not inconsistent with impaired adaptive functioning. As I mentioned earlier, one can have, you know, some skills or abilities in certain areas and still overall have impaired adaptive functioning.

N.T. PCRA Hearing, 11/16/12, at 94. Dr. Jacquin also testified that intellectually disabled individuals can, through repetition, "learn the skills needed to perform a fairly basic job." *Id.* at 35.

Appellant also presented at his PCRA hearing the testimony of Dr. Susan Rich, a defense expert in the field of diagnosing, counseling, and treating Fetal Alcohol Spectrum Disorder ("FAS"). Based on her physical, neurological, and psychiatric examinations of Appellant, Dr. Rich diagnosed Appellant with partial FAS. N.T. PCRA Hearing, 10/24/12, at 33. After the Commonwealth completed its cross-examination of Dr. Rich, the PCRA court initiated the following exchange:

> PCRA Court: Doctor, how would you explain if you were, I don't know if you were aware or were told what, that in his adult life, Mr. VanDivner was able to pass the difficult commercial driver's license examination and function in that capacity. How would you explain that based upon what you testified today?
>
> Dr. Rich: I can tell you that a person who is limited in the ways that he is, if he is, through memorization, over and over and over and over again, someone is working with that person to help them learn anything if it is one on one, and they are going over and over and over.
>
> PCRA Court: Here you are making some assumptions then?
>
> Dr. Rich: I am not because there is evidence that someone did that with him?
>
> PCRA Court: Worked over and over and over and over with him. There was evidence of that?
>
> Dr. Rich: To just . . .
>
> PCRA Court: What is that evidence?
>
> Dr. Rich: Was an affidavit and I don't know about testimony, but it was an affidavit and report of an ex-wife that she worked with him for you know hours and hours and hours on

end. And that in his driving career, someone drove with him to find a way and he and I discussed that when I met with him, how he was able to do that and he said he would never be able to get where he needed to go if it weren't for someone riding in the truck with him. So either, I believe one of his children. The other thing in his case that's different is he grew up with a truck driving dad who he went on long trips with often. And he you know helped him understand sort of the mechanics of being a truck driver.

PCRA Court: So then someone who in your opinion is mentally retarded can be taught or trained or whatever to pass these examinations and to function?

Dr. Rich: Yes.

PCRA Court: And also, a number of your answers and just not only to the question I just asked but in your testimony was based on what Mr. VanDivner said to you or told to you. Is that correct?

Dr. Rich: Not just what he told me.

PCRA Court: No, I am just saying . . .

Dr. Rich: It was corroborated by other testimony that I reviewed. So yes, I gathered some information from him but none of my testimony is based solely on my discussion with him because in fact as most individuals with FAS, are not very good historians. You have to gain collateral and that's why there were volumes and volumes of information presented to me.

*Id.* at 53-55.

The expert testimony presented at Appellant's pretrial and PCRA hearings simply does not support the PCRA court's conclusion that Appellant's ability, after a lengthy and intense period of coaching, to memorize and answer true or false questions on an oral CDL test, demonstrates "appropriate adaptive functioning in the areas of conceptual, social, and practical skills." PCRA Court Second Supplemental Opinion, 12/8/16, at 3-4.

Additionally, the PCRA court's determination that Appellant maintained employment as "a successful over-the-road truck driver for many years", *id.*, and demonstrated practical skills by maintaining trucking logs, as well as the PCRA court's statement that there was no evidence that Appellant was "incompetent" at his job, are belied by the record. As noted above, Dr. Jacquin testified at Appellant's PCRA hearing that Appellant's social security earnings revealed that, when he was working as a truck driver, he earned approximately 9 percent of what the average American worker earned at the time, and was not able to hold a job for a long period of time. N.T. PCRA Hearing, 11/16/12, at 95-96. There also was repeated and uncontradicted testimony that Appellant was always accompanied by a friend or family member on his trucking trips because Appellant could not read the maps, count the money for the tolls, and had difficulty keeping up with the logs. N.T. PCRA Hearing, 11/16/12, at 130 (Ms. DiJoseph testifying that she did all the paperwork, including the logs, and that Appellant never went on trips alone); N.T. Pretrial Hearing, 11/29/06, at 135 (Appellant's sister, Alice Lisanti, testifying that "there was always someone riding with" Appellant on his trucking trips); N.T. Pretrial Hearing, 1/11/07, at 323 (Appellant's sister, Mildred Patton, testifying that Appellant never took trips by himself and was always accompanied by a friend or one of his brothers).

For all of the above reasons, we hold that the PCRA court's factual finding that Appellant failed to establish that he has significant adaptive limitations because he was married and maintained relationships with his family, was able to learn the content of the CDL study guide and pass an oral version of the exam, and was able to maintain a job as a truck driver, is not supported by substantial evidence. Indeed, the evidence presented at Appellant's pretrial and PCRA hearings, which we have detailed above, clearly demonstrates that he suffers from significant adaptive limitations in the areas of

conceptual, practical and social skills, *notwithstanding* the fact that he was able to pass a non-written CDL exam after extended study. *See Williams*, 61 A.3d at 992 (in determining whether an individual has significant limitations in adaptive functioning, the focus should be on an individual's weaknesses, as opposed to his or her strengths); *Moore v. Texas*, 137 S.Ct. at 1050 (in determining whether an individual is intellectually disabled under *Atkins*, the focus should be on the individual's adaptive deficits, rather than his or her adaptive strengths). This evidence also undercut the testimony of Dr. Wright, the Commonwealth's sole expert witness. Thus, with regard to the first prong of Appellant's ineffectiveness claim, we find that Appellant's underlying claim that an intellectually disabled individual could pass a non-written CDL exam after extended study has arguable merit. We now must determine whether, under the second ineffectiveness prong, there existed any reasonable basis for counsel's failure to present at Appellant's pretrial hearing evidence to establish the same.[19]

---

[19] As discussed above, in our December 29, 2015 opinion, we held that the PCRA court's factual finding that Appellant failed to establish that his intellectual disabilities existed prior to the age of 18 was not supported by substantial evidence; accordingly, we remanded the matter for a supplemental opinion addressing whether there was any reasonable basis for counsel's failure to obtain and introduce certain evidence that would have supported that fact, and whether Appellant was prejudiced. We further instructed the PCRA court to address the remaining two *Miller* prongs, i.e., limited intellectual functioning and significant adaptive limitations. In a concurring opinion, Chief Justice Saylor agreed with the majority's remand for consideration of the remaining *Miller* prongs, but stated:

> I am circumspect about directing that the remand proceedings necessarily should be channeled through an ineffectiveness overlay. The United States Supreme Court has held that the execution of an intellectually disabled offender is excessive under the Eighth Amendment; thus, the federal Constitution places a "substantive restriction" upon the government's power to take the life of such an offender. [*Atkins*, 536 U.S. at 321]; *see also Brumfield v. Cain*, [135 S.Ct. 2269] (2015) (characterizing *Atkins* as "recogniz[ing] that the execution of the intellectually disabled contravenes the Eighth Amendment's prohibition on cruel

(continued…)

With regard to analyzing the reasonable basis prong under an ineffective assistance of counsel claim, this Court has explained:

> Under prevailing constitutional norms as explicated by the United States Supreme Court, capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pre-trial investigation, or make reasonable decisions rendering particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgement supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct."

*Commonwealth v. Sepulveda*, 55 A.3d 1108, 1128 (Pa. 2012) (citations omitted).

Further, when considering a claim related to counsel's alleged deficient

---

(…continued)

> and unusual punishment"). Given the execution-eligibility terms in which the *Atkins* restriction is phrased, it would appear that a strong argument exists that, if Appellant is determined to be intellectually disabled, the sentence of death must be vacated, irrespective of whether trial counsel can be faulted for failing to marshal a better case to prove the disability. At a minimum, I suggest that the trial court direct supplemental briefing on the point.

*VanDivner II*, 130 A.3d at 697 (Saylor, C.J., concurring) (footnote omitted). The PCRA court did not direct supplemental briefing on the issue, and, although Appellant addresses the issue in his brief, the Commonwealth, as noted above, filed a no-answer letter, declining to address any issues. Regardless, Chief Justice Saylor's point is well-taken, and there may come a time when this Court will need to address whether an adjustment to existing post-conviction requirements is warranted for cases involving *Atkins* claims. Nevertheless, as the PCRA court previously held that trial counsel had no reasonable basis for failing to present evidence that Appellant's intellectual disabilities manifested prior to age 18, PCRA Court Opinion, 1/12/16, at 2, and because, with respect to Appellant's adaptive behavior, we can conclude from the record that trial counsel had no reasonable basis for failing to introduce evidence to demonstrate Appellant's significant limitations in adaptive behavior, we leave that assessment for another day.

performance in failing to investigate and present mitigating evidence, we consider several factors, including "the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented." *Id.*

Appellant contends that, based on Dr. Wright's report, trial counsel knew that the Commonwealth would attempt to use his ability to pass a written multiple-choice CDL exam to disprove at his pretrial *Atkins* hearing his claim of limitations in adaptive behavior. A review of the record confirms that the Commonwealth attempted to do so. For example, after Dr. Bernstein testified that, in his opinion, Appellant suffers from limitations in adaptive behavior, the Commonwealth cross-examined Dr. Bernstein as follows:

> Q: Were you aware that he had a commercial driver's license, a CDL license?
>
> A: Yes, we discussed that.
>
> Q: And are you aware of the testing procedures that one undertakes to receive that CDL license?
>
> A: Yeah, I used to be an over-the-road truck driver, so I know something about CDL licenses.
>
> Q: So, you're aware that there's approximately 70 multiple choice questions that one must answer with a passing rate of 80 percent to become a CDL-licensed driver.
>
> A: Right, and that is not -- that is correct. It would −− It's not an arbiter of who is or isn't mentally retarded. People with mild mental retardation can work and can pass certain vocational tests in order to work.

N.T. Pretrial Hearing, 11/27/06, at 29.[20]

---

[20] On redirect, trial counsel asked Dr. Bernstein if Appellant had told him "that he had someone else take the CDL test for him." N.T. Pretrial Hearing, 11/27/06, at 42. Dr. Bernstein replied that Appellant had related that he had "perpetrated certain frauds in
(continued…)

In another instance, after trial counsel asked Mr. Sedlock whether an intellectually disabled individual could "take limited tests if they're coached or assisted," and he responded in the affirmative, elaborating that such individuals, when given the same type of work on a regular basis, can complete "[r]epetitive, routine tasks," *id.* at 81, the Commonwealth questioned Mr. Sedlock as to the incongruity of his opinion that Appellant cannot read a newspaper, use a telephone directory, or write in a checkbook, but was able to correctly answer 80% of a 70-question multiple choice test in order to obtain a CDL. *Id.* at 88.[21]

The Commonwealth also presented the testimony of PennDOT employee Ronald Beatty, who stated that, in 1992, Appellant would have been required to take a 70-question written multiple choice test in order to obtain his CDL, and that, to his knowledge, the CDL was "[n]ever administered over the telephone." N.T. Pretrial Hearing, 11/29/06, at 174, 180.

Moreover, Dr. Wright, the Commonwealth's expert, testified that, in his opinion, Appellant "does not have a diagnosis of mental retardation," because, *inter alia*, he previously "was able to function to the degree that he took and passed the CDL examination, he was able to drive a truck, things like that." *See* N.T. Pretrial Hearing, 12/8/06, at 250-51.

Appellant maintains that, in light of the Commonwealth's attempt to undermine his proffered evidence of significant limitations in adaptive behavior with evidence that he passed a written CDL exam, there was no reasonable basis for trial counsel's failure to present evidence (1) to demonstrate that individuals with limitations in adaptive

_____

(…continued)
regards to the testing procedure in order to obtain the license," but that they did not discuss the details. *Id.* at 43.
[21] Ultimately, the trial court sustained defense counsel's objection to that line of questioning, on the basis that it assumed facts not in evidence. *Id.* at 89.

behavior can pass a non-written version of the exam after extended study; and (2) that Appellant himself passed an oral, not a written, version of the exam, and only after extended coaching by his ex-wife. Specifically, Appellant asserts that trial counsel should have investigated and presented the testimony of (1) Dr. Askov, who testified at Appellant's PCRA hearing that PennDOT offered an oral CDL exam which a "severely limited person intellectually" could pass, N.T. PCRA Hearing, 10/24/12, at 67; (2) Mary Christy, whose name appeared on the report of Appellant's CDL exam, and who testified at the PCRA hearing that Appellant had passed an oral, true-or-false version of the exam; and (3) Appellant's ex-wife, Judith DiJoseph, who testified at Appellant's PCRA hearing that she coached Appellant for several hours a day for two months to prepare him for taking the oral CDL examination. Based on our review of the record, we agree with Appellant that trial counsel's investigation fell below the above-noted constitutional threshold, and that trial counsel had no reasonable basis for failing to present such evidence.[22]

At Appellant's PCRA hearing, trial counsel acknowledged that members of Appellant's family spoke with her regarding, *inter alia*, Appellant's "limitations, his work history, [and] how he was able to get his commercial driver's license," as well as "instances of how, the things that they did to assist him." N.T. PCRA Hearing, 1/30/13, at 90, 97. Trial counsel specifically referenced the fact that Appellant's wife "filled out the log when he was driving his commercial vehicle." *Id.* at 97. However, despite trial

---

[22] In order to prevail on a claim that trial counsel was ineffective for failing to present a witness, an appellant must demonstrate that (1) the witness existed; (2) counsel was either aware of or should have been aware of the witness's existence; (3) the witness was willing and able to cooperate on behalf of the defendant; and (4) the proposed testimony was necessary to avoid prejudice to the defendant. *Commonwealth v. Tharp*, 101 A.3d 736, 757 (Pa. 2014). Dr. Askov, Ms. Christy, and Ms. DiJoseph each signed an affidavit indicating that, had they been contacted at the time of Appellant's pretrial hearing, they would have been available and willing to testify.

counsel's admitted knowledge that Appellant's family assisted him both in obtaining a CDL and in working as a truck driver, trial counsel failed to offer any reasonable explanation for her failure to present evidence to establish how Appellant, who demonstrated significant adaptive limitations in almost every aspect of his life, was able to obtain a CDL:

> PCRA Counsel: Now, were you, you were informed by [Appellant] that he took this CDL exam over the phone, weren't you?
>
> Ms. Zerega: No.
>
> PCRA Counsel: No? Is it possible . . . .
>
> Ms. Zerega: There were various. . . .
>
> PCRA Counsel: I am sorry?
>
> Ms. Zerega: There were various versions of what happened. He wasn't certain that he remembered. Then one of the sisters indicated that Harry, maybe it was the wife, I don't know which, but I got information that the brother who looks very much like James or did at that point, the males all very similar they said, and having met one brother, he does look very much like James, that this brother also did, and had taken the test for him. There was some discussion later about a phone exam. But again I don't know that James ever took the test himself.[23]

---

[23] Appellant's sister, Alice Lisanti, testified that she knew "[Appellant] didn't take the written portion of the test," and, in fact, believed that someone else may have taken the exam for him "over the phone." N.T. Pretrial Hearing, 11/29/06, at 134. However, Mr. Sedlock testified that Appellant told him that he took the test to receive his CDL, N.T. Pretrial Hearing, 11/27/06, at 88, and, as noted above, Dr. Wright's report, which was introduced into evidence at the pretrial hearing, indicated that Appellant "reported that the CDL examination was given over the phone, that he failed several times, but eventually, after studying the material, was able to successfully test." Report of Bruce A. Wright, 12/2/06, at 4 n.4 (Commonwealth's Exhibit G to December 8, 2006 Pretrial Hearing).

> PCRA Counsel: Did you attempt to obtain records from PennDOT related to that, to the CDL?
>
> Ms. Zerega: I did contact PennDOT. They indicated that it can be done over the phone but they wouldn't have records as to how someone took it that would go back that far.
>
> PCRA Counsel: Did you attempt to obtain anybody to testify to that fact?
>
> Ms. Zerega: Not specifically, no, because they couldn't say whether James took it by phone or not.
>
> PCRA Counsel: Did you ask them to locate any records regarding James taking the CDL examination?
>
> Ms. Zerega: I asked them if they would have them. They informed me they didn't go back that far.
>
> PCRA Counsel: Who did you ask?
>
> Ms. Zerega: I don't know. I called somebody in Harrisburg. I believe that's where it was. And I talked to the people locally to find out who I should talk to and they gave me records.

N.T. PCRA Hearing, 1/30/13, at 115-16.

Although, as trial counsel testified, there may have been conflicting testimony at the pretrial hearing as to whether Appellant actually took the CDL exam himself, and, if so, whether he took a written or oral version of the exam, such conflicting testimony warranted, at a minimum, further investigation into the matter. The 1992 report of Appellant's CDL exam that was introduced into evidence at Appellant's pretrial hearing identified Ms. Christy as the Examiner, yet trial counsel did not attempt to contact her to confirm the type of exam Appellant passed in order to obtain his CDL. Had counsel done so, she would have been able to establish that Appellant passed an oral, as opposed to a written, version of the CPL exam, thereby expressly disproving the pretrial hearing testimony of Mr. Beatty, and undermining the Commonwealth's reliance on

Appellant's purported ability to pass a 70-question written multiple choice exam to disprove his claim of significant limitations in adaptive behavior.

Additionally, despite the contradictory nature of the statement in Dr. Wright's report that Appellant claimed to have passed the CDL exam *after studying the material*, and the testimony of numerous witnesses that Appellant is *unable to read*, trial counsel did not contact Ms. DiJoseph, the individual to whom Appellant was married and lived with at the time he took the CDL exam, to attempt to determine how Appellant was able to study for and pass an oral version of the CDL exam. Had counsel obtained this information from Ms. DiJoseph, counsel would have been able to demonstrate how, consistent with the expert testimony presented by Appellant both at his pretrial and PCRA hearings that intellectually disabled individuals can pass certain vocational tests, particularly when coached or assisted by others, Appellant was able to pass an oral version of the CDL exam, thereby significantly undercutting the opinion of the Commonwealth's sole expert witness, Dr. Wright, that Appellant is not intellectually disabled because he passed the CDL exam. Accordingly, we are compelled to conclude that trial counsel's performance was the result of insufficient investigation, and not any reasonable strategy.

The final prong that Appellant must establish to obtain relief based on his ineffectiveness of counsel claim is that he suffered prejudice as a result of counsel's error, measured by whether there is a reasonable probability that the result of the proceeding would have been different. *See Pierce*, 786 A.2d at 213. To reiterate, under *Miller*, an individual is intellectually disabled, and ineligible for the death penalty, if he suffers from limited intellectual functioning, significant adaptive limitations, and onset prior to age 18. Although the PCRA court recognized that Appellant suffers from limited intellectual functioning, with onset prior to age 18, it determined that, in view of his

ability to obtain a CDL, Appellant did not demonstrate that he suffers from significant adaptive limitations.

However, for the reasons expressed above, we reject this determination, and conclude that, given the evidence presented at Appellant's PCRA hearing, combined with the evidence presented at his pretrial *Atkins* hearing, Appellant has demonstrated that he suffers from significant limitations in adaptive behavior. As Appellant has established all three prongs of *Miller* - limited intellectual functioning, significant adaptive limitations, and onset prior to age 18, he has demonstrated that he is intellectually disabled, and ineligible for the death penalty. Accordingly, we hold that Appellant has satisfied all three prongs of his ineffectiveness claim.

Having concluded that Appellant is entitled to relief under the PCRA based on his ineffectiveness of counsel claim, and because the evidence establishes that Appellant is intellectually disabled under the standard set forth in *Miller*, and, thus, is ineligible for the death penalty, we vacate his judgment of sentence of death and direct that his judgment of sentence be modified to reflect the imposition of a life sentence on the first-degree murder conviction, subject to appellate review of Appellant's remaining guilt phase and sentencing claims. Appellant filed, on June 2, 2017, an Application for Relief requesting, *inter alia*, that this Court decide all issues raised by Appellant. However, as this matter is now a non-capital case, we deny Appellant's Application for Relief, and transfer this appeal to the Superior Court for disposition of these remaining claims. *See Gibson*, 925 A.2d at 171 (case that becomes a non-capital case on appeal is transferred to Superior Court for review of remaining claims).

Judgment of sentence of death modified to reflect a life sentence on Appellant's first-degree murder conviction. Case transferred to Superior Court. Jurisdiction relinquished.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht did not participate in the consideration or decision of this matter.